All right, so you may come on up. I see my clock's already running so I'll start. May it please the court, we are here on a denial by the district court with regard to a qualified immunity issue as to the one remaining officer left in this case, Lieutenant Mike Lewis, as you'll also hear him referred to as Commander. We believe that the undisputed evidence that was presented to the district court and is before this court and that the magistrate judge correctly ruled provided us with a summary judgment on qualified immunity as to Lieutenant Mike Lewis. The presiding judge then reviewed the findings, conclusions, and recommendations and we believe he erred in not properly considering the undisputed evidence that's before the court. As the court will know, I'm stressing undisputed evidence before the court because it's an important thing here, because we have two judges that basically reached different conclusions on the same evidence and is there an explanation for it? Yes. The district court in looking at the evidence that was presented came up with, for whatever reason, the belief in this issue that Lieutenant Lewis was the one that was actually the lead person on this raid into the house. That is not the facts in this case. There's no evidence to support that and as I will show throughout my argument today, you will see that he was not the lead person on this SWAT team. He was the commander in charge. We did point this out in our brief, so it is in our brief. It's central to our appeal because the Fifth Circuit case law, Rogers versus Hooper, which two members of this court are very familiar with, maybe all three, but two were involved in the opinion, that situation is even a little different than the one we have here because in that case, Hooper was one of the lead people going into the house. We don't have this here and as stated in the Magnolia case decided by plaintiff's counsel or the appellee, the Fifth Circuit has jurisdiction to decide what legal consequences flow from the undisputed evidence in this case, the facts. Here the plaintiff or the appellee never disputed any of the facts cited by defendant in this case. I'll repeat that. The plaintiff or the appellee never disputed any of the facts cited by the defendant in their summary judgment and never discussed in any way whatsoever any of the actions of Lieutenant Lewis or any of the officers before the SWAT team entered the house. There is no dispute of the facts and no discussion by the appellee of any actions that they felt were improper by Lieutenant Lewis or anyone else on this SWAT team before they entered the house. All the discussion in the amended complaint and in response to the summary judgment was all related to when they entered the house. On the initial decision, if you will, on which house, I heard you saying he wasn't the leader of the SWAT, whatever, but as commander was he not, quote, in charge of discerning which of the houses the SWAT team would enter in the first place? I hear what you're saying about what happens once they're in, but in terms of figuring out which house to go in, wasn't that Commander Lewis's? It was in part Commander Lewis's, and I'm not going to stand before this court in any way at all and say mistakes weren't made that night. There were mistakes made that night, and we stand by the fact that that's something we certainly have to live with, but we have to look at what the undisputed evidence, Judge Stewart, with regard to what did he do, what did he do to determine whether or not he did what a reasonable officer would have done under the circumstances, and that's what I'm here to present to the court, the facts that show. As you'll see, the district court, and you've read the opinion, the district court goes into saying, really, this isn't hindsight 2020, and with all due regard to the district judge, that's exactly what this is. The district judge is saying there are things that this officer should have done more things, but I think it's important that the court understand here that the plaintiffs did not dispute in any way the after-action report which we admitted into evidence. These facts, again, were undisputed, and so when we're looking at the legal consequences from that, we go back and we start to look, and we have to decide whether Commander Lewis made a reasonable effort to identify the correct residence and whether that was consistent with what a reasonable officer would do. The numbers, you know, if the numbers were on the curb, and one of the houses had a handicapped rail, and all that stuff, wouldn't it be reasonable to discern? I mean, a reasonable officer wouldn't look at those objective factors to discern the correct house? I mean, that's not . . . as you say, those factors aren't disputed in terms of where the numbers were, and blah, blah, blah, right? So a reasonable officer would not have used the same undisputed facts? Well, I think there's two things that are important, Judge, to answer that, and I appreciate the opportunity to do that. As in the Hooper case, they noted in great detail the different things that were different from one house to the other, one of them being a large tree in the front of one house, and that versus the other not having one, and that both the houses had marked numbers. As the court knows, and as I'm attempting to stress to this court, whenever this situation occurred and they came to the house, not anything unlike what happened in Hooper, they were supposed to be led to the correct house. The person leading them to the house in this situation was not Lieutenant Lewis, it was an officer with a different agency that had been part of the task force with the DEA, this was their raid, and he was a Lancaster police officer by the name of Beauchamp. He was the one that was supposed to lead them to the house where the trailer was supposed to be parked in front of the house. He was to stop one house before they would know that they needed to go to the next house. He stops at the house, which the trailer was not at the correct house, it was one off. He stops, he gets out, and he motions for all the officers to go into the wrong house. This is the Lancaster police officer. Lieutenant Lewis is along with other DEA agents in the back of this area, so we have the police cruiser, we have the SWAT vehicle, we have the DEA cars, and then we have Lieutenant Lewis who's further down the street. So to answer the question about looking at the curb and seeing the street number, he wasn't there. He was not right there where the SWAT team was stacking up to go into the house. He was further down. So there was not an opportunity, as the district court suggested he possibly could have looked at the street curb, he wasn't there. He was further down the street. They were being motioned in, by the way, by a Lancaster police officer who was originally a defendant in this case, but was dropped out by the appellee at some point during this process. So they were directed to go in. The suggestion by the district court that this was not a fast-moving, tense situation is simply not correct from the undisputed facts that we have from the affidavit of Lieutenant Lewis to looking at the after-action report. So when that officer incorrectly signaled for these officers to go running into the wrong house, it was Lieutenant Lewis who spotted the fact that he had had a picture given to him a couple of hours earlier from the DEA, and I think it's important to point out his involvement in this case began at 7-17 that night, and this raid occurred somewhere around 10-40 that night. So he notices that something's not right, that the house doesn't look right. He doesn't just simply say, oh, and do nothing. He sits there and looks and compares the house, and by the way, the house that they went into versus the house that was the target house are two very similar houses, with the exception of the handicap ramp, as the court has pointed out. Again, this is in the dead of night. This is dark. Lieutenant Lewis didn't just send them into another house either. He looks and he says in his affidavit, again, undisputed, I attempted to look at the house number on the house. Due to the glare of the light on the post, I could not see it. Instead of saying 5-7-3, it should have been 5-9-3. So the numbers were clear enough, but where he attempted to distinguish and to make sure if that was the correct house before they went in. It certainly helps for us to have these facts emphasized for us. We've seen them, but we've read a lot of cases for this week, and it's helpful to have you emphasize them. To me, the problem here, you talked about the Hooper case. Hooper itself talks about 11th Circuit case. They very much are determined by the facts. The 11th Circuit case had been greater surveillance during the day, the houses were more dissimilar in Hooper itself, the houses were next to each other, they're relatively similar. What we have here are, it seems to me, several opportunities to have gotten this right. Couldn't quite see the number, but nonetheless said go ahead, could have made greater efforts to make sure that it was the right number. The house didn't look right, and it didn't pursue that. We're not saying your client loses, but we're just saying now there are, not we, the district courts are saying now there are factors that require this to go further. I don't know . . . Your Honor, if I could address that . . . That's the best way to respond, but do you agree that this comes down to whether your client acted objectively unreasonably? I think that we have to look at the facts that are before this court. Is that true? Is that the standard we're looking at? Yes. Whether he objectively acted unreasonably? Whether he was inconsistent with what any reasonable officer would have done under this situation. The 11th Circuit case that the court points out was one that occurred in the daylight, and so it was distinguished. The Hartsfield case, I believe, it's Hartsfield. Right. Hartsfield. To some extent, our HOOPA opinion was unpublished, but at least it's guidance to us. The 11th Circuit is not in our circuit, but it's also guidance to us. Looking at this case, trying to decide what was the reasonable thing for an officer to do, which is not our usual qualified immunity issue, usually it's a clearly established law regarding some event, but this is a more fact-based, case-by-case determination. Your Honor, if I could address that, I think it's a very good point. The thing I would point out to the court are a couple of things. One, it is a fact. I mean, it is a fact analysis here, but the other thing that's incredibly important in this case is the plaintiff never . . . I say plaintiff, the appellee never pled this in their amended complaint that's before this court. There is no pleading with regard to the actions of Lieutenant Lewis or any of the officers outside the house. Not only did they not do that, they didn't offer any evidence in our summary judgment. The very first time this issue of Lieutenant Lewis ever came up with regard to his actions was after the summary judgments had been sent to the court. The magistrate judge makes a very excellent point as well, if I could point out, that basically says that, you know, once the magistrate defendants have brought forward evidence to show that they engaged in reasonable efforts to identify the correct address. I think it's important, Your Honor, to point out too, at no time did the plaintiff or appellee here ever separate out Lieutenant Lewis from the other defendants. If you go back and look at the record, it's always defendants, plural, did this, defendants, plural, did that. There is no specific criticism or argument in his amended complaint and in his summary judgment response talking about the actions of Lieutenant Lewis. In fact, in the reply back, you'll see whenever he replies back after the district court in these briefs that are before this court, the appellee simply starts to quote what the district court said. The reason is, is because they had not ever even argued this before and so I think it's important and I've tried to set out and I'm going to run out of time, but I think I'll come back too and point out that the district court magistrate was on to this from the very beginning and she says, you haven't presented any evidence, Mr. Appellee. She says, plaintiffs generally argue that the 215 page appendix creates fact issues about how the defendants acted incompetently. The court goes on to note that the plaintiff has neither identified specific evidence of the record or articulated a precise manner which supports its claims of objective unreasonableness and said where the summary judgment evidence, the non-movement fails to provide this information, the evidence is not before this court and that you cannot make those reasonable inferences with regard to using that evidence that's not before the court. Thank you. All right. Thank you, sir. You've reserved your rebuttal rights. Yes. Thank you, Your Honor. Mr. Reynolds? If it pleases the court, counsel, I'm Ernest Reynolds from Fort Worth, Texas. It's my privilege today to represent the Jefferson Parks family and to try to defend the Fourth Amendment that my father fought to defend at the Battle of the Bulge. He did and then he was a career federal employee and he did his best to comply with and respect all of our laws. I was raised in that tradition and I see here that what we have is a judge that we all know, a learned district judge who has done a very careful job of sorting out the facts and I believe has made a correct decision. I would like to point out some things about the argument you've just heard, if I might please. First, over and over we've heard that there's undisputed evidence. The only way you can get to that is to accept the evidence as it's interpreted by counsel for the defendants and the defendants and pay no attention to all of the evidence that we put into the summary judgment record. I would draw the court's attention to some of that that is attached as record excerpts in the brief that we have filed. For example, excerpt number three, the warrant that shows there's no mention of my clients or of the address of their house. Record excerpt number four, a memorandum about five days after the invasion of my client's home from Police Chief Goolsbee who's clearly upset about what has happened and he sees that there's an error and he says it should not have occurred and he sends this to the Internal Affairs Division. That's a decision no police chief makes lightly. That's part of the evidence we put into the record. Record excerpt number five, one of the several photographs that we put into the record of the deposition of Chief Goolsbee which, by the way, speaks in great detail about the conduct of Defendant Lewis. That's what it's almost all about. And this picture, although it doesn't copy too well, shows that there are not one but two sets of wheelchair ramps going into the house of my clients. There were none a few houses down at the house that was the subject of the warrant. I might add if you look at the probable cause affidavit, the probable cause affidavit appears to be a fine affidavit but it says, and it's put into the record by opposing counsel, it says nothing about my clients. It says nothing about their home. We also have affidavits here from a neighbor across the street . . . But last point, you just mean that it says nothing that would be understood to be describing this home? There's no reason why the affidavit would be referring to that home since it's not a target home. So if I don't understand your point about the affidavit . . . That's the exact point I'm making, Judge Smith. Okay. I just want to make sure what you meant. Now, if you look at our excerpt number six in the record, this is the declaration of Rebecca DeSantis, part of our summary judgment evidence, which the other side seems to think doesn't exist, but it does. And she's the neighbor, and she . . . and by the way, it's not in the record of the case yet, but I'll tell opposing counsel, we recently discovered and obtained videos taken by the DeSantis family and got them. And unless we're not permitted to go back downstairs, we'll give them to him. But she's telling us here that she's got firsthand knowledge. She hears a loud explosion. She's concerned. After a few minutes, she leaves her house. There are police officers in my client's home. They question her, but let her in. She finds Mrs. Jemerson cut up with glass because all the windows were broken up. This was a military-style invasion. That's what it amounts to. And by the way, as a young man, I was an assistant at graduate school, a school where we started up a criminal justice program, and we were training officers, and I'm not anti-law enforcement. I know we need police, but we need police who act reasonably. And we have proof. I would guide you to our excerpt number 10, and I note to you that in the briefing file before you, none of these things have been challenged. They're all part of the record without being challenged by opposing counsel. This is the detailed index of the deposition of the police chief, where he says that he has no regret about the sanction against Lewis, that Lewis acted unreasonably, that this was something that never should have happened, that there were findings made by the people that did the internal affairs investigation, correctly I would assert in view of the plain language of the Fourth Amendment, that this home invasion of my client's home was illegal. This should never have happened. And it was clearly by the admission . . . Let me stop you there for just a minute. Yes, I'm sorry. We are focusing on the reasonableness of Officer Lewis's action. Damages, what happened when he went inside, would be for later. So focusing on what happened and whose fault it was and how Lewis himself acted unreasonably is what we need from you. And it seems to me, one of the things I'm concerned about, I haven't looked exactly how you presented this in the district court, but it's necessary in making claims against officers under 1983 or any people subject as defendants to separate each defendant. It's not a group liability, it's individual liability. So you have this evidence you're talking about, some of which identifies Lewis, but did your actual arguments to the district court on summary judgment identify Lewis and what Lewis himself specifically did? Are you saying it's all in the evidence and that's because your friend on the other side was saying the magistrate judge really thought all of these people were grouped together. Is that how you presented it? I'm not saying it's fatal, but I'm just asking you to tell me factually, did you group all these people together in your arguments to the magistrate judge and then . . . No. . . . the district? First of all, because we couldn't get any information at first, but we knew that Lewis was involved. We sued him first and talked in detail about his conduct in the original complaint. Later, we had the names of other officers and we added them. At the summary judgment stage, we had the deposition of the police chief, Goolsbee, which as I pointed out is summarized in our record excerpt 10. We put that into the record. We were able to talk about . . . Was this a full-fledged, did you have full-fledged discovery? No. I'm sorry. . . . qualified immunity. Pardon me? Was this full-fledged discovery or was this discovery limited to the issue of qualified immunity? It was kind of neither. We didn't get any discovery until finally we had a hearing and the hearing transcript is in the record and the judge said, I can basically take a deposition of someone who wasn't going to be a party, but by that time, we were being herded along quickly to a summary judgment proceeding in the blind with no discovery. I had said written discovery, which was objected to and not answered in substance. Was there a motion to dismiss based on qualified immunity? There was a summary . . . if you're talking about like a 12B motion. Yeah. Was there a motion to dismiss based on qualified immunity? And regardless of what happened to it, I know summary judgment is often what happened. I'm just asking, was there an initial motion to dismiss? As I recall, there were lots of early motions. We were flooded with them and it was confusing, but I think it was a . . . I'm asking because the procedure has been clarified by . . . I think it was a Rule 7, I think it was called a Rule 7 motion, which is a little unusual but it does happen in the Northern District. But the real action on this that got us to the point of coming to this court was a summary judgment motion to clean the slate and a magistrate who granted it without any argument and then I filed a motion to the district court asking for reconsideration and I was frankly very thankful and I will also say very surprised because I know how busy district courts are that we got this detailed opinion and that's why I put so much of it in the brief because it shows that the district judge did exactly what he was supposed to do under the Magnolia opinion and under Rule 56. He looked carefully at everything in the record, looked at the evidence from both sides, found there was a fact issue and concluded that with a fact issue, this should go to the jury and my understanding is that that's what this court did, I think, as recently as last year in the Magnolia case, saying we don't have jurisdiction to determine fact issues. If there's a fact issue, it goes to the jury. So . . . Counsel, I'm . . . Pardon? And I apologize if I seem overly enthusiastic. I'm thankful for the oral argument. My clients are thankful. I know we have limited time. They're good people. They're law-abiding people. They're citizens like you and me. We're all equal under the law and we're all entitled to Fourth Amendment protection of our homes and they were in their home. No dispute. Let me ask you this. Counsel Opposite was asserting, I think, about your pleading about the amended complaint, I believe, if I wrote down. In essence, he was saying your pleadings don't individualize how Commander Lewis somewhat, I guess, to the question, the point Judge Sopher was making about under our law, you need to individualize treatment of each person. So would you respond to his argument about your amended complaint vis-à-vis Lewis' involvement here? Yes, Judge Stewart. The first thing I would note is he never made that complaint to the trial court or to the magistrate. That complaint came up and I've pointed that out in my appellee's brief. For the first time as points that he now created, he could have gone back to the district judge and said, I want to complain about these points, but instead he presented them for the first time to this court. So I don't think he's got them preserved for appeal. The second thing is, we did talk in detail in our pleadings and in our evidence to the greatest extent we could about what had gone on, and there was a lot about what went on in the residence. That's true. We had the other parties there, but there was also a lot about what Lieutenant Lewis did. If the court or one of the clerks assisting the court looks at this clear, clear as day, he's talking about the misconduct, the unreasonable conduct, the conduct he says he would not expect of any competent officers with emphasis on the Commander Lewis, who he had admitted fault in writing to the internal affairs investigators as noted . . . I get you, and I'm not disputing any of that. I just failed in putting it in my material up here to have the live complaint in front of me, and I was just . . . I just perked up counsel was arguing about what you said or didn't say about Lewis's . . . I was just trying to ask you to respond to the complaint part, not the other parts of the evidence in there, but that was his argument that Lewis is not delineated in the complaint. I don't have it up here in front of me, so I'm just asking you . . . But Lewis is delineated in the pleading with sufficient clarity. Okay. If he had had a doubt, my good friend and opponent today could have raised this very question to the magistrate or the trial judge, or even after he did not like the trial judge's order, he could have complained and asked for reconsideration. It never came up, and when it came up, I respectfully submit, and I put this in my appellee's brief, he defined this as an appeal point, but he never really addressed it in any great specific manner as the appellate rules appear to indicate you're supposed to do. First you have issues, and then you discuss them. So basically, this is some folks that know they messed up badly, and they did something horrible, horrible, that should never happen in America, anywhere, to anyone, and it was unreasonable, and no competent police officer of experience would do it, and the judge, the trial judge, has carefully sifted through the evidence to show things that should have been done, and to look at the case law, and compare the case law to the facts. As you pointed out, Judge Southwick, these are fact-sensitive matters, and one thing he's pointed out that hasn't come up today is that Lewis, as the commander, either himself or having someone do it for him, should have driven by the location, and I'm going to tell the court something else, and I'm an officer of the court, and I'm not trying to mislead you. This guy, Beecham, who was mentioned, he got out by filing an affidavit that his lawyer supplied saying that he wasn't anywhere near the house, that he was off at a corner a couple of blocks down directing traffic, but later, I got records from the city. I had sought them not in the litigation from the lawyers, but from the city. The city said everything to the Texas Attorney General and said, shield it. The Texas Attorney General then said, no, turn it over, and lo and behold, I got a tape recording that showed me that Beecham, by now out of the case, was exactly where counsel said he was, but not where Beecham said he was when he got out of the case. So, things happen in these cases, and what we're here today about is whether or not a fair-minded, competent, learned, experienced district judge who, by the way, as all of you probably know, before he assumed the bench, was the city counsel in Dallas and knows about police law from all angles, what did he do? What he did was to comply properly and fully with Rule 56 and to give us an opinion that says, I don't know who wins at trial, but this is an issue of fact that goes to the jury. I believe that's what he should have done, not only under Rule 56, but under your Magnolia case of recent vintage. I think that's what he should have done, and I hope and sincerely pray that this court will agree and we'll be given our day in court. All right. Thank you, sir. Thank you very much. My clients, thank you, too. They're the ones who are important. I'm just their lawyer. Thank you, sir. We appreciate it. All right. Back to you, Mr. Montgomery. Thank you. Again, to re-stress and to conclude on this, the amended complaint, which the court will have a chance to look at, will show that plaintiff does not, the appellee here, does not reference individual defendants and talk about their actions. Isn't that an issue you needed to raise before the magistrate of the court? Did you? Well, it was raised before them. It was, and in fact, that's the reason that the magistrate judge, Your Honor, says that plaintiffs have neither identified specific evidence in the record nor articulated the precise manner in which it supports their claims that defendant's conduct was objectively unreasonable. Was that raised . . . did the magistrate judge say that in response to an appellee who has just noticed that? We raised those arguments. Yeah, we did because it was very apparent that none of this was specific. It was always defendants, defendants, defendants, and it was always after they entered the house. This new theory came up of Lieutenant Lewis after the court granted summary judgment and qualified immunity for the remaining officers. Well, help me understand. I mean, there were a whole bunch of people who were sued and various and sundry of them got out at different stages of the case. I guess I'm going to have to look, but I'm not understanding exactly how different people kind of were jettisoned. I'm not passing judgment on whether they should or should not. In other words, you've got some seriatim of people, some of which says, I'm out because of this. You said Lancaster, and then we have others. How could all of that have occurred if there wasn't some delineation about individuals in the complaint? Do you understand my question? Yes, I do. The short answer is the district court judge said, you were the commander, the buck stops here, I think is kind of the wording that he used when he said, this isn't a 2020 deal. That's not my question. I'm coming back to your assertion about all the defendants were just sort of grouped in mass. That was what you argued. We'll look at it to be sure, but your argument was they were all just kind of grouped in mass without any specification about Lewis. I heard that. I'm just saying, asking for clarity. Different ones, Lancaster, and I don't remember the other name, there were a bunch of people sued. Some people got out of the case in varying ways. I'm trying to understand how that occurred if there wasn't an individualized set of assertions about the different ones. We'll look at it to be sure, but that's what I'm asking you, not about the evidence in the sorting. Very good question and a very good point, and very to the issue in this whole thing. The district court decided on his own to sever out Lieutenant Lewis. As you'll see in the pleadings and the summary judgment arguments and what were claimed by the appellees, he was not severed out as somebody having different responsibility. The question about he should have driven by the location, I think real quick if I can, this all I said began at 7-17 that night on March 27th. It was a DEA operation. We were required to assist. The city of Waxahachie was required to assist. To answer the court's question, they did not sue the city in this case, so it was just against the individual officers. Basically, Lieutenant Lewis was put in contact with the DEA agent and he was given basic information. He then requested additional information, pictures of the target area. Well, let me stop you. We're going to give you a lot of facts, and both of you really want to give us all these facts to try to memorize, but hold it, just hold it. Just trying to come back to points you raised earlier, not more fact on it. One of your arguments when you were up, you said Lancaster from, I don't know, Waxahachie or some place, was really the person who was in charge. That's what you argued initially, right? I said he was the one that led the team to the house. Exactly, and I'm only asking you about that. Counsel Opposite said, not true, Lancaster didn't perform the way you said, but in fact was somewhere remote and not there. And I'm just asking your rebuttal response about what's your argument about Lancaster in this scenario. That's all I'm asking. Sure. Hold it, counsel. No, sir. Just be seated. No, sir. Your Honor, may I have a chance to respond? Sure. I'm not trying to trick you, I'm just, rebuttal is to rebut arguments that were made. And on your opening, you made an argument that Commander Lewis didn't really lead this. And you said where he was located, et cetera, and we heard it. Okay, and to say the Waxahachie Police, Lancaster, whatever, was really the one who directed body, body. We got that part. On his argument, he said, not so. Lancaster was really somewhere else. And so all I'm asking you is a question on rebuttal to respond to that assertion. That's all. Sure. So the undisputed facts in this case show that the Lancaster police, the city of Lancaster is different than the city of Waxahachie. We have nothing to do with the city of Lancaster. He, in fact, was the only evidence before this court was that Beauchamp with Lancaster was the one put in charge to lead these units and everyone to the correct house. And I believe what counsel was saying, that's the reason he let him out because he was told he was somewhere else, but he later learned after the fact that he, in fact, was the one that led him to the house and was, in fact, the one that was the lead vehicle. And so the other point I was going to make on that is he keeps talking about, why didn't he drive by the house? And I think the evidence that's in the court here is one of the pieces of information that was given to Lieutenant Lewis is that there was real-time surveillance on that house already  So there was not a need to go and find the house because the DEA, through their agency and through Lancaster, were going to lead us to the house, and that didn't happen. Good stopping point. All right, we appreciate it. Both of you passionately argued on behalf of your clients, and we appreciate the zeal that is expressed. We will look in the record in great detail and try to sort out what occurred and get it decided as soon as we can. Thanks to both sides for the presentation. All right, the case will be submitted. Yes, sir, you are.